No. 31,816

L. F. DOUGAN and MARY DOUGAN, *Appellants,* v. THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF SHAWNEE, THE CITY OF SILVER LAKE, J. I. ANDERSON, MRS. M. NEDEAU, CHARLES D. WILLIAMS, C. HENRY, FLORENCE LAFROMBOIS, NYRA BOYLES, R. F. HODGINS, THOMAS H. WHITEMAN, EMMETT BERRY, JR., THE KANSAS STATE BOARD OF HEALTH and M. C. WAX, *Appellees.*

(43 P. 2d 223)

Opinion filed April 6, 1935.

*Allen Meyers, Bennett R. Wheeler, S. M. Brewster, John L. Hunt, Margaret McGurnaghan, Ralph M. Hope* and *John H. Hunt,* all of Topeka, for the appellants.

*Clarence V. Beck,* attorney-general, *Earl V. Swarner,* assistant attorney-general, *Forrest D. Smythe* and *Morton B. Cole,* special assistant attorneys-general, *Lester M. Goodell,* county attorney, *Paul L. Harvey* and *Hall Smith,* assistant county attorneys, *A. Harry Crane, Ward D. Martin* and *Erle W. Francis,* all of Topeka, for the appellees.

The opinion of the court was delivered by

HARVEY, J.: Plaintiffs sued to enjoin the board of county commissioners from building a dam across what they alleged to be a natural watercourse on land owned by them. By amended pleadings the state board of health, certain property owners and the city of Silver Lake were made parties defendant. The state board of health and the county commissioners, constituting the local board of health, defended upon the grounds that plaintiffs had cut a ditch in the watercourse in such a way as to drain a natural lake stocked with fish, creating a health menace, a recurrence of which was imminent. The property owners who owned the land on which the lake, or some part of it, was situated contended plaintiffs had drained a natural lake on their land, which they desired to keep, and by a mandatory injunction sought to require plaintiffs to fill the ditch they had cut, or deposit a specified sum with the court to be used for that purpose. The city of Silver Lake owned a part of the lake bed and joined with the landowners, and also joined with the health authorities, on the ground of a nuisance. After a full hearing and a view of the premises the trial court made exhaustive findings of fact, denied the injunction prayed for by plaintiffs and authorized defendants to build the dam to a height designated as an elevation of 76. Plaintiffs have appealed.

In the valley of the Kansas river, about ten miles west of Topeka and on the north side of the river, which there flows eastward near the south line of the valley, there is and has been for many years a body of water known as Silver Lake. It was there when the land originally was surveyed by the government in 1862. Presumably it is an old river bed. Its general outline is that of a horseshoe, with the round part to the north and the ends to the

south toward the present thread of the river. On the whole it covers parts of four sections of land. The west end has been fairly well filled up. Part of it is cultivated for farm land, but part of it is wet and swampy, and cattails and slough grass grow. The north and northeast part consists of a large body of water, with well-defined banks, along which large trees have grown. That part of it is about a mile in length and perhaps a quarter of a mile wide at the widest place. Its area is 118 acres. The water is from a few inches to about three feet deep. Formerly it was much deeper, but was partially filled by dirt washed in at the time of the 1903 flood, and perhaps to some extent at other times. The lake is fed by springs within the lake, by surface water, and by a draw from the west, along which there was constructed a few years ago what is known as the Rossville drainage ditch. A tile drain from a state highway also drains into it. The lake, when flooded from heavy rains, drains into the river through the east end. That, over the course of years, has been pretty well filled up, but a small natural ditch let the water drain off. If the lake became greatly flooded by heavy rains the water ran out over a wider area along the east end, and perhaps some of it along the west end, into the river. South of the lake proper, and between that and the river, a county road had been constructed. This was on a grade several feet higher than the land on each side. The road was high enough to act as a dike to prevent the waters of the river, in ordinarily high water, from overflowing the lands north of it. At the place where this road crossed the east end of the lake there was a culvert. Along the south side of the culvert floodgates had been constructed, to be put in place when the river was up, to keep the water of the river from flowing back up into the lake, and to be opened at other times so that the water from the lake might flow to the river. The accompanying plat outlines the situation. While perhaps not accurate in all details, it is fairly so. The defendants, Nedeau, Williams, Henry, Lafrombois, and the city of Silver Lake, collectively, own most of the land upon which the lake proper is situated. Plaintiffs own the land marked in their names in sections 16 and 17 and south to the river. The county road is shown, together with the culvert and floodgate thereon; also is shown the city of Silver Lake, U. S. highway No. 40, and the railroad. For the purpose of running levels and contour lines the surveyors took the top of an iron

stake at the northwest corner of section 17 as a bench mark and gave to it the arbitrary figure of 100. Elevations mentioned refer to this bench mark. The north and east banks of the lake are higher than the south and west banks by perhaps ten to fourteen feet. The north bank is almost perpendicular, while that on the

south slopes gradually to a few feet higher than the water of the lake. When heavy rains cause unusually high water in the lake some of the water spreads over part of the land to the south. At some time prior to the commencement of this action plaintiffs had built a levee near the north line of sections 16 and 17 to a height of 79.6 so as to keep the water of the lake off their lands from the north. There is evidence that the normal height of the water in the lake was 78. Perhaps at some times it was higher than that, at others lower, and upon three occasions in the last thirty-five ·or forty years the lake was dry, or nearly so. In the summer of 1931 plaintiffs caused a ditch to be dug in the east end of the lake from the culvert north, through what was perhaps a portion of the old river bed filled in years ago, for a distance of 1,600 or 1,700 feet, and into the body of the water of the lake itself as much as 400 feet. This ditch was dug with a steam shovel and is twenty feet wide at the bottom, forty feet wide at the top, and about seven and one-half feet deep, when measured from the east side near the culvert. The effect of this was to drain much of the water from the lake proper, resulting in a health menace because of dead and decaying fish, decaying vegetation and stagnant pools of water, which became breeding places for insects deleterious to health. The forestry, fish and game commission learned of this and attempted to take the fish out of the lake, and did succeed in taking out between twenty-five and thirty tons of edible fish, but were unable to get all of them, and five or six tons died in the lake. The attention of the state board of health was called to this health menace, and at its June meeting in 1932, having investigated the matter, and fearing a recurrence of the nuisance, passed a resolution recommending the board of commissioners of Shawnee county take action to prevent a recurrence of the nuisance either by completing drainage of the lake, or by maintaining sufficient water in the lake to support fish life. Prompted by this resolution the board of county commissioners on July 8, 1932, commenced the construction of a dam about five feet in height across the ditch leading from the south end of the lake to the culvert at a point about thirty feet north of the culvert in the county road and on land used for highway purposes. It was the construction of this dam plaintiffs sought to enjoin; their obvious purpose being to drain water from as much of their land as they could without regard to what effect their action would have upon fish in the lake, sanitary conditions of the people

of the city of Silver Lake and vicinity, and without regard to the rights of other parties who, collectively, own the major portion of the lake.

Appellants complain of the form of the final judgment of the trial court in that it *permits* defendants to build the dam to a height of 76, but does not *require* them to do so, nor fix any penalty upon them if they fail to do it. We are unable to see why appellants should complain of that. They do not want any dam built, and contend they would be better off if it were not built. It is the building of the dam, not the failure to build it, of which they complain. If the decree is open to the objection they make it is one favorable to them rather than to their detriment, hence they cannot complain about it.

Appellants point out that the court did not order them to restore conditions by placing a dam in the stream as the defendant property owners by their mandatory injunction sought to have done. We think the court might very well have done that, but there is no cross-appeal by the property owners. This again is a matter of which appellants are in no position to complain. If these defendants are willing to permit the county to go to the expense of building the dam, or to build it themselves without asking appellants to build it or pay the cost thereof, the ruling is to that extent favorable to appellants and they cannot be heard to complain of it.

With respect to the action of the state board of health and of the board of county commissioners acting in this matter as the local board of health, appellants contend the injunction was not justified because there was no nuisance existing on July 8, 1932, at the time the construction of the dam was started; that the evidence of nuisance relates to the summer of 1931. It is argued that the health authorities were not authorized to attempt to abate a nuisance which did not exist. The evidence on this point was that the lake contained fish; that the water in the lake was low; that it was the beginning of the season of hot weather, at which time there is much evaporation of the water from the lake; that sometimes for several weeks in the summer there are no rains sufficient to cause water to run into the lake, and that a recurrence or repetition of the nuisance of 1931 was imminent. In such a situation we do not understand health authorities are compelled to wait until the actual evil is upon them and comfort and health have been destroyed before they act, but, on the other hand, that they are authorized to take prudent

measures to prevent an imminent health menace. On this point the court found:

"27. There are now fish in Silver Lake. That in order to protect the fish life existing in said lake during the dry seasons of the year, taking into consideration the hot weather prevailing during the summer months, the periods of drought, and in order to prevent, if possible, a recurrence of the conditions existing in 1931 and consequent nuisance and menace to public health, the court finds that the elevation of the surface of the water in Silver Lake should be maintained at the point of 76; which, according to the evidence, will maintain the water in Silver Lake at a depth of twenty to forty inches, under ordinary conditions.

"28. That if the water in Silver Lake is allowed to drain out to the depth of the drainage ditch now constructed from the south end of the said lake to the Kaw river, very little, if any, water will remain in said lake during the dry, hot seasons of the year; resulting in the death of fish in said lake and the decay of vegetable matter collecting therein, and thereby constitute a public nuisance and a menace to the health of the community."

These findings are supported by the evidence, and justify the state and county boards of health in taking necessary and proper steps in the interest of the public health. The health authorities are not limited to punishing those who violate their orders, as provided in R. S. 65-159. Our statute (R. S. 65-101) grants quite extensive authority. This covers polluted waters (R. S. 65-161 to 65-171), including stream pollution found detrimental to public health, or to animal or aquatic life (R. S. 1933 Supp. 65-171a). They may take such action as may be necessary to secure the abatement of such conditions (R. S. 1933 Supp. 65-171d). They are not compelled to wait until the health menace—discomfort, ill health, and perhaps death—is actually present. To be of real value health authorities must have authority to take such action as is necessary to prevent a health menace which is reasonably likely to occur under the facts and circumstances applicable thereto. As tending to support these views, see: *State, ex rel. Nowotny, v. Milwakee*, 140 Wis. 38, 121 N. W. 658; *State v. Laabs*, 171 Wis. 557, 177 N. W. 916; *Cardwell v. Austin*, 168 S. W. 385 (Tex. Civ. App.); *Barrett v. Mt. Greenwood Cem. Ass.*, 159 Ill. 385, 42 N. E. 891; *People v. Truckee Lumber Co.*, 116 Cal. 397, 48 Pac. 374.

Appellants cite *Freeman v. Scherer*, 97 Kan. 184, 154 Pac. 1019, and authorities there cited, also decisions from other states, to the effect that ordinarily an injunction will not be allowed to prevent a condition which merely is anticipated. The principal case was to enjoin the maintenance of a ditch, plaintiff contending that his land

was likely to be overflowed. The injunction was denied on the ground that there was no reasonable probability of the anticipated injury, nor any showing that it could not be compensated in damages should it occur. In the opinion it was said:

"Injunction is not used to prevent a prospective injury unless it appears that there is a reasonable probability of injury and that the law will not afford an adequate remedy." (p. 188.)

Those conditions are met here. The facts and circumstances indicated a reasonable probability of health menace in 1932 like the one experienced in 1931, and it is not seriously contended if it occurred it could be compensated in damages. In *State v. Lindsay,* 85 Kan. 79, 83, 116 Pac. 207, it was said:

"Courts of equity are reluctant to use the process of injunction where the remedy by indictment or information is efficacious, but will not hesitate where the remedy is not adequate and it is necessary to protect the rights of the public or an individual. A court is not powerless to prevent the doing of an act merely because it is denounced as a public offense. (Citing authorities.)"

Another answer to this contention suggests itself. It is the plaintiffs in this case who were seeking an injunction rather than the boards of health. They were simply taking such measures as they thought proper to prevent a nuisance, the occurrence of which they reasonably believed to be imminent.

Appellants' principal contention, however, is that under the evidence they were entitled to have an injunction preventing defendants from putting any dam in the ditch which they had dug. They argue that the lake, with the waters flowing into it and out of it to the river, constitutes a natural watercourse, and on that point the parties agree. They say they own this natural watercourse at the place where the ditch was dug. There is no controversy about that. They say they did not dig the ditch any deeper than the natural ditch which was already there, and complain that the court did not make a finding to that effect, although they requested one. The court was justified under the evidence in not making such a finding. At best the evidence on the point was conflicting. It is true witnesses called by plaintiffs testified the ditch was not dug any deeper than the old one was or than the old one had been at some prior time. This last thought is based on testimony that what was taken out of the ditch in excavating it with a steam shovel was silt which at some time had filled in. From all the evidence in the record, that might have filled in when the lake proper was forming. There is testimony

that some forty years or more ago what is spoken of as the east end of this lake was wide, and that near the east side of it was a small, natural ditch or ravine from the lake toward the river; that this gradually filled up and one developed near the west side of the east end of the lake; that this was not very deep, not deep enough to bury a hoop net, the hoops of which were four feet in diameter; that perhaps it had been washed out a little deeper, but it also had been filled up partially at one place by cattle crossing; that plaintiffs caused a ditch to be dug from a point about 400 feet north of the south end of the water in the lake some 1,600 or 1,700 feet south to the culvert in the county road and deep enough that water from the lake, as much as six inches deep, followed the steam shovel all the way. The court was justified in refusing to find appellants had not deepened the outlet for this water. The evidence was to the contrary. Certainly they had widened it from a narrow natural ditch to one that was twenty feet wide at the bottom. When this was done the depth of the water in the lake was materially lessened.

Silver Lake, with the draw or ravine which has been converted into the Rossville drainage district coming into it from the west, and with its outlet through the east end of the lake to the river, constitutes a natural watercourse. The parties agree on this, and the court so found. Each of the individual defendants, Nedeau, Williams, Henry, Lafrombois, and the city of Silver Lake, owned a part of the bed of this natural watercourse. The rights of the individual owners above and below each other along this natural watercourse are the same as those along any nonnavigable natural watercourse or stream. Each of them owns a part of the bed of the stream—in this case a part of the lake. They own the water in the stream or lake just as much and under the same rights as they own the bed of the stream, or the banks, or the trees thereon. The lower owners have no right to ditch or dredge the stream on their land so as to take from the owners of the stream above them the natural flow or accumulation of water on their lands. They might with equal right attempt to take the land itself. All of this is settled law in this state. (See *Clark v. Allaman*, 71 Kan. 206, 80 Pac. 571, citing earlier cases; also; *Cities Service Gas Co. v. Riverside Drainage Dist.*, 137 Kan. 410, 413, 20 P. 2d 520, and cases cited, and *United States v. Central Stockholders' Corporation*, 52 F. 2d 322, 328.) Counsel for appellants recognize the force of these au-

thorities, but contend they do not apply here, mainly for two reasons: (1) They contend appellants did not dig the ditch any deeper than the natural draw or outlet was from the lake proper to the river, and they complain the court did not make a finding to that effect, which they had requested. We have heretofore considered that question and conclude the court was justified in refusing to make such a finding for the reason there is much evidence—obviously the more persuasive evidence—to the contrary. (2) They contend the ditch was dug under some order or direction of and paid for by the state highway commission. That organization is not a party to this action and we do not attempt to determine any of its rights or liabilities in the matter. It is sufficient to say that no one contends it would have any greater right to drain this lake from the lands of the individual property owners than would the appellants have. The record, in so far as it is abstracted on this point, tends to show that when U. S. highway No. 40 was paved northwest of Silver Lake, an eighteen-inch tile was laid along one side of the pavement for some distance—how far is not disclosed—for the purpose of draining the highway. This drained some surface water into the lake. The appellants, or persons on their behalf, complained to the state highway commission that this would increase the volume of water in the lake and cause it to have a tendency to overflow more of appellant's land, to their damage, and that in settlement of this claim for damages the state highway commission paid the appellants $750. Appellants then employed a contractor to construct the ditch previously mentioned. The work was paid for either by appellants from the moneys obtained from the state. highway commission, or that money was paid directly to the contractor. The record before us is not clear on that point. Without further comment on this point it is sufficient to say that we do not regard the transaction of appellants with the state highway commission, and anything it is shown by the record to have done in the matter, as having any bearing on the rights of the parties to this action.

We find no error in the record of which appellants can complain. The judgment of the court below is affirmed.